**JWB**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Martin Sanders, | No. CV 03-0523-PHX-EHC-MEA |
| Plaintiff, | **ORDER** |
| vs. | |
| Charles Ryan, et al., | |
| Defendants. | |

Before the Court are Defendants' Motion for Summary Judgment (Doc. # 94), Plaintiff's Response (Doc. # 105), and Defendants' Reply (Doc. # 111). After careful review of the pleadings and the record in this case, the Court will grant Defendants' motion and enter judgment for Defendants.

**I.     Procedural History**

Plaintiff is an inmate incarcerated at the Arizona Department of Corrections (ADC), who brought this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed a Second Amended Complaint on April 18, 2005, presenting eleven claims for relief against Defendants ADC Director Schriro, ADC Corrections Officers Baldwin, Benson, Rodriguez, Ennis-Bullock, John Doe, Richard Roe, William Woe, and the State of Arizona (Doc. # 55). On January 10, 2006, the Court granted the parties' stipulation to dismiss Counts III - VIII and XI and Defendants Schriro, Baldwin, Benson, and Rodriguez (Doc. # 84). Because none of the remaining claims concern Defendants Doe, Roe or Woe, they too will be dismissed

from this action. Consequently, only Defendants Ennis-Bullock and the State of Arizona and Counts I, II, IX, and X of the Second Amended Complaint remain before the Court.

**II.   Factual History**

   **A.   Counts I and II**

Plaintiff raises the same issues in Counts I and II–violation of his religious exercise rights. Plaintiff is and has been at all relevant times an adherent of the Independent Fundamental Baptist faith. Plaintiff avers that a fundamental aspect of his religion is the opportunity to attend religious services and to listen to the preaching of a pastor of Plaintiff's faith. To this end, Plaintiff listens to tape recorded church services from the North Ridge Baptist Church.

The ADC has implemented Department Order (DO) 909, which delineates the property an inmate may possess. During the time relevant to this lawsuit, Plaintiff was housed at the Eyman Unit - Special Management Unit I (SMU I). Plaintiff alleges that Defendant Ennis-Bullock prevented him from possessing all of the tapes that DO 909 permits and, thereby, violated his right to practice his religion. Specifically, Plaintiff claims that DO 909 permits him to possess ten audio cassette tapes and that he had ten in his possession (Doc. # 55 at 6).[1] He alleges that when two new religious tapes were mailed to him, Ennis-Bullock refused to allow him to add the tapes to his possessions, labeling them "contraband" and "in excess" of the property limit (Id.). Plaintiff alleges that he asked to exchange two tapes already in his possession for the two new tapes but that Ennis-Bullock told him that he had to "dispose of[,] . . . not store" the two exchanged tapes (Doc. # 55 at 7). Plaintiff refused to dispose of any of his tapes and, in response, Ennis-Bullock refused to give the new

---

[1] Plaintiff takes issue with the number of tapes he was allowed have in his possession. Plaintiff acknowledges that he was housed in SMU I, which has a limit of five audiotapes, but claims that because he was "a level 5 prisoner who was non I-5" (Doc. # 105 at 5), he was permitted to have ten audiotapes in his possession. DO 909 directly contradicts this contention. DO 909 provides that prisoners housed at SMU I, where Plaintiff states he was housed (Doc. # 55 at 7), may possess only five audiotapes (Doc. # 95, Ex. 1A at 56-57). In any event, that factual issue, whether Plaintiff could possess five or ten audiotapes, is not material to whether summary judgment should be granted. Celotex, 477 U.S. at 322-23.

tapes to Plaintiff. Plaintiff claims that Ennis-Bullock's actions substantially burdened Plaintiff's free exercise rights in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the First Amendment, and A.R.S. Title 41, Chapter 9.

### B.     Count IX

Plaintiff is hearing impaired. He asserts that while housed in SMU I, he was authorized to possess a television and headphones for use in his cell. On October 11, 1999, Plaintiff claims that a television and a "pair of Optimus Nova - 42" headphones were delivered to the prison for his use. Plaintiff avers that the headphones are designed to "mitigate [Plaintiff's] hearing disability" (Doc. # 55 at 21). Plaintiff claims that SMU I staff allowed him to possess the television but refused to allow him to possess the headphones, instead placing them in his "stored property."

After a brief transfer to another unit, Plaintiff was again housed in SMU I on January 18, 2000 (Doc. # 55 at 21). Upon his return to SMU I, Plaintiff was again not permitted to have the headphones in his possession. Consequently, Plaintiff claims that he was forced to listen to his television through his walkman-brand headphones, which did not permit him to hear the television bi-aurally (Id.). Plaintiff alleges that the State of Arizona's denial of access to his "Optimus Nova - 42" headphones violates the Americans with Disabilities Act.

### C.     Count X

Plaintiff also asserts a claim for discrimination against the State of Arizona for its failure to notify him individually when services are available or activities are occurring in his unit. Plaintiff avers that he has repeatedly asked SMU I supervisory staff to inform him when certain services are available or activities are occurring so that he could participate because he is unable to hear announcements adequately. Plaintiff claims that the State of Arizona has refused to accommodate him because he is not completely deaf, which he asserts constitutes discrimination based on his disability.

## III.    Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine

- 3 -

1  issue as to any material fact and that the moving party is entitled to judgment as a matter of
2  law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
3  When considering a summary judgment motion, the evidence of the non-movant is "to be
4  believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty
5  Lobby, Inc., 477 U.S. 242, 248 (1986).  These inferences are limited, however, "to those
6  upon which a reasonable jury might return a verdict." Triton Energy Corp. v. Square D. Co.,
7  68 F.3d 1216, 1220 (9th Cir. 1995).

8  Rule 56(c) mandates the entry of summary judgment against a party who, after
9  adequate time for discovery, fails to make a showing sufficient to establish the existence of
10 an element essential to that party's case, and on which the party will bear the burden of proof
11 at trial. Celotex, 477 U.S. at 322-23. Rule 56(e) compels the nonmoving party to "set forth
12 specific facts showing that there is a genuine issue for trial" and not to "rest upon the mere
13 allegations or denials of [the party's] pleading." The nonmoving party must do more than
14 "simply show that there is some metaphysical doubt as to the material facts." Matsushita
15 Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue
16 for trial unless there is sufficient evidence favoring the non-moving party. Anderson, 477
17 U.S. at 249. Summary judgment is warranted if the evidence is "merely colorable" or "not
18 significantly probative." Id. at 249-50.

19 **IV.  Religious Exercise Claims**

20 Plaintiff contends in Counts I and II that his rights under RLUIPA, the First
21 Amendment's Free Exercise Clause, and A.R.S. Title 41, Chapter 9, have been violated.
22 Specifically, Plaintiff alleges that his rights to practice his religion were substantially
23 burdened by Ennis-Bullock's refusal to give him new religious tapes unless he disposed of
24 other religious tapes already in his possession. Because the standard under RLUIPA is more
25 favorable to Plaintiff than that under the First Amendment, the Court will begin its analysis
26 of Plaintiff's religious claims under that Act.

27 /   /   /
28 /   /   /

- 4 -

### A. RLUIPA

Under RLUIPA, a government may not impose a substantial burden on the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). This "compelling government interest" and "least restrictive means" test replaced Turner's "legitimate penological interest" test. Warsoldier, 418 F.3d 989, 994 (9th Cir. 2005)(citing 42 U.S.C. § 2000cc-1(a)). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." Id. at 995 (citing 42 U.S.C. § 2000cc-3(g)). The Supreme Court has upheld RLUIPA against an Establishment Clause challenge. Cutter v. Wilkinson, 544 U.S. 709 (2005).

The inmate bears the burden of establishing prima facie that RLUIPA has been violated and that his religious exercise has been substantially burdened. Warsoldier, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b)). The government then bears the burden of proving that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. Id. at 995 (citing 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b)).

#### 1. Substantial Burden

An inmate-plaintiff bears the initial burden of demonstrating that his religious exercise rights have been substantially burdened. Warsoldier, 418 F.3d at 994. "[A] 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." Id. at 995 (quotations omitted). An inmate's religious exercise is substantially burdened "'where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief.'" Id. Even indirect compulsion can substantially burden religious exercise. Id.

Plaintiff claims that Ennis-Bullock's refusal to *exchange* new audiotapes for tapes already in Plaintiff's possession and to allow the older tapes to remain in Plaintiff's stored property, violates his rights under RLUIPA. Plaintiff primarily argues that Ennis-Bullock

- 5 -

violated provisions of A.R.S. § 31-228(A) and, thereby, substantially burdened his religious exercise. Section 31-228(A) provides that when an inmate is discharged "there shall be returned to the prisoner everything of value taken upon commitment to [ADC], or thereafter received by the prisoner." Citing Blum v. State of Arizona, 829 P.2d 1247 (Ariz. Ct. App. 1992), Plaintiff seemingly contends that Ennis-Bullock cannot, under § 31-228(A), require him to dispose of property and that she has substantially burdened his religious practice by requiring him to dispose of old religious tapes before giving him new ones.

The Court disagrees for at least two reasons. First, Blum concerned disposal of property already in an inmate's possession when a different prison regulation, ADC Management Policy 301.17, was implemented. Policy 301.17, the validity of which Plaintiff has not challenged, has since been superceded by DO 909, which became effective on October 11, 1999. Second, in Blum, the court invalidated Policy 301.17 because it conflicted with the express provisions of § 31-228(A) and had been implemented after the statute became effective. In doing so, however, the court specifically stated that:

> [ADC] may adopt policies limiting the amount of property prisoners may keep in the cells but any such items *disallowed from immediate possession, which were previously authorized*, must be stored and maintained pending a prisoner's release . . . . Nothing in § 31-228(A), however, prevents [ADC] from adopting policies to prohibit, in the future, the acceptance of inmate property into the [prison] system either at initial commitment or subsequently.

Blum, 829 P.2d at 1253 (emphasis added). Under Blum, therefore, ADC could adopt a policy to prohibit future acceptance of new property. Thus, after DO 909 took effect any property received *in excess* of the amount allowed under DO 909 is *unauthorized* and may be disposed of by the prison. That procedure does not contravene § 31-228(A) because the excess property had never been "previously authorized." Cf. Blum, 829 P.2d at 1253. Perhaps more importantly, Plaintiff could have received new tapes by simply complying with DO 909 by disposing of old or excess tapes. The only individual standing between Plaintiff and the receipt of new religious audiotapes was Plaintiff himself.[2]

---

[2] To some extent, Plaintiff seems to conflate the right to practice his religion with the right against deprivation of property without due process, an issue which is not before the Court in this case.

- 6 -

More significantly, Plaintiff fails to set forth how the exercise of his religion has been substantially burdened regardless whether Ennis-Bullock's acts or DO 909 violated A.R.S. § 31-2289(A). The violation of a state statute requiring the return of authorized inmate property to the inmate upon release does not, *ipso facto*, constitute a substantial burden on an inmate's religious practice merely because the property is religious in nature. Moreover, Plaintiff does not argue that he was unable to practice his religion absent receipt of new tapes. Indeed, Plaintiff acknowledged during his deposition that he could practice his religion by repeatedly listening to the audiotapes he had (Doc. # 95, Ex. 6 at 4-5). Furthermore, Plaintiff had the opportunity to practice his religion by engaging in personal Bible study and prayer and by receiving pastoral visits from an accredited minister (Doc. # 95, Ex. 4 at ¶ 12).

In sum, Plaintiff has not presented evidence supporting his assertion that his religious practice has been substantially burdened by Defendants. Even if Plaintiff had, however, Defendants have advanced uncontradicted evidence of a compelling governmental interest in ADC's property policy as the least restrictive means available.

**2.     Compelling Government Interest and Least Restrictive Means**

A defendant has the burden of showing that a substantial burden on an inmate's religious practice furthers a compelling government interest and is the least restrictive means of doing so. Warsoldier, 418 F.3d at 995. Further, "'prison officials *must* set forth detailed evidence, tailored to the situation, . . . that identifies the failings in the alternatives advanced by the prisoner.'" Id. at 1000 (citations omitted) (emphasis in original).

Defendants argue that ADC's property policy is the least restrictive policy to maintain the security of the prison. Prison security and safety are compelling governmental interests. Warsoldier, 418 F.3d at 998. According to the affidavit of Associate Deputy Warden Jeffrey Freeland, ADC has limited resources and staff and to enhance both the safety and security of its maximum security facilities, it restricts the quantity of property each inmate may possess (Doc. # 95, Ex. 1 at ¶ 6). This is sufficient to establish the existence of a compelling

governmental interest in maintaining safety of maximum security facilities by limiting the amount of property an inmate may possess in his cell or in storage.

ADC's policy also appears to be the least restrictive means available. Under DO 090.1.14.2, Plaintiff could mail excess religious tapes back to the church from which they were sent (Doc. # 55, Ex. 3 at ¶ 10) and, in exchange, receive new ones. That procedure allowed Plaintiff to choose the property he wished to possess without overwhelming ADC's capacity to store inmate property. Plaintiff has not suggested an alternative that is less restrictive but still accommodates the government's compelling interests in security and safety.

Moreover, ADC's policy provides that an inmate may exercise his religious beliefs and practices, which can be limited only to achieve the legitimate penological objective of preserving order and security. Specifically, Plaintiff is permitted to practice his religion by engaging in personal Bible study and prayer, receiving pastoral visits from an accredited minister, and listening to religious tapes. Plaintiff conceded that his ability to practice his religion is not affected by repeatedly listening to the same tapes (Doc. # 95, Ex. 6 at 4-5). Further, Plaintiff is able to exchange old tapes for new ones by disposing of tapes already in his possession. Plaintiff's decision not to do so does not substantially burden the practice of his religion. Consequently, Defendants will be granted Summary Judgment on Plaintiff's RLUIPA claim.

**B.     First Amendment**

The First Amendment provides in relevant part that the government shall not prohibit the free exercise of religion. U.S. Const. amend. I. Nevertheless, free exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). To prevail on a free exercise claim, an inmate must show that a defendant substantially burdened the practice of his religion by preventing him from engaging in conduct mandated by his faith without justification reasonably related to legitimate penological interests. Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997); cf. Coronel v.

Paul, 316 F. Supp.2d 868, 879 (D. Ariz. 2004) (it is whether a practice is important to the prisoner and motivated by sincere religious belief rather than whether the practice is "mandated" by his faith that is determinative, citing Thomas v. Review Bd. of the Indiana Employment Sec. Div., 450 U.S. 707, 715-16 (1981)).[3] To substantially burden the practice of an individual's religion, the interference must be more than an inconvenience, Freeman, 125 F.3d at 736, or an isolated incident or short-term occurrence, see Canell, 143 F.3d at 1215 (interference that is relatively short-term and sporadic was not substantial).

As discussed above, the Court has determined that Plaintiff's right to exercise his religion has not been substantially burdened. Further, the Court has found that even if Plaintiff's rights have been substantially burdened, Defendants have established that ADC's policies serve a compelling government interest in the least restrictive way possible. Because Plaintiff's First Amendment challenge only requires Defendants to demonstrate that their policies are "reasonably related to legitimate penological interests," Freeman, 125 F.3d at 736, and Defendants have already satisfied a more stringent test, Defendants are entitled to summary judgment on Plaintiff's First Amendment claim as well.

## V. Discrimination Claims

In Counts IX and X, Plaintiff alleges that the State of Arizona discriminated against him on the basis of his hearing impairment. Specifically, Plaintiff asserts that the State's refusal to provide him with bi-aural headphones and personally to alert him of prison activities violates the Americans with Disabilities Act of 1990 (ADA) Title II, 42 U.S.C. § 12132.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

---

[3] In Thomas, the Supreme Court held that where a plaintiff claims to believe that a practice is central to the practice of his religion and the sincerity of that belief is not challenged, the belief is entitled to First Amendment protections. 450 U.S. at 715-16. The ability, however, of a prisoner to obtain whatever he decided was necessary to practice his religion without "even a tenuous connection to some principle of the religion . . . would be inimical to preserving institutional order, safety, and security of the inmates and staff." Doty v. Lewis, 995 F. Supp. 1081, 1083 (D. Ariz. 1998).

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As used in this provision, a "public entity" is defined in part as "(A) any State or local government; [or] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government. . . ." 42 U.S.C. § 12131.

To state an ADA claim, a plaintiff must allege that he:

> (1) is a handicapped person; (2) that he is otherwise qualified; and that [prison officials'] actions either (3) excluded his participation in or denied him the benefits of a service, program, or activity; or (4) otherwise subjected him to discrimination on the basis of his physical handicap.

Duffy v. Riveland, 98 F.3d 447, 455 (9th Cir. 1996). The ADA requires that the impairment substantially limit one or more of the individual's major life activities. 42 U.S.C. § 12112(a). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

Recently, the Supreme Court held that Congress validly abrogated Eleventh Amendment immunity under the ADA (42 U.S.C. § 12202) for a money-damages claim against a State, at least when the claim is premised on conduct that allegedly violates the Fourteenth Amendment. United States v. Georgia, 126 S.Ct. 877 (2006) (hereafter Goodman). The Court did not decide whether the abrogation of immunity was valid for a claim premised on conduct that was *not* allegedly violative of other constitutional provisions. Id. at 882. The ADA is applicable in a prison context. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998); Armstrong v. Wilson, 124 F.3d 1019, 1022-25 (9th Cir. 1997).

The Supreme Court articulated a step-by-step analysis for Title II claims and explained that a lower court should:

> determine . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Goodman, 126 S.Ct. at 882. Consequently, a court must first determine which aspects of a State's alleged conduct violated Title II. If the State's conduct does not violate Title II, a court will not proceed to the next step in the analysis. Buchanan v. Maine, 469 F.3d 1588,

- 10 -

172-73 (2006). This Court will analyze each of Plaintiff's two discrimination claims in turn to assess whether there is evidence that Title II has been violated by Defendant.

### A.   Bi-Aural Headphones

In Count IX, Plaintiff alleges that because he was not permitted to possess bi-aural headphones, he was denied meaningful access to television, including entertainment, education and prison programs, and information (Doc. #105 at 17). Plaintiff further claims that Defendant's actions discriminated against him based on his impairment in violation of Title II.

### 1.   Title II Prong

It is undisputed that Plaintiff is hearing impaired and that he is a "handicapped individual" under Title II (Doc. # 106, Ex. 26 at 1-2). The State also does not dispute that Plaintiff is "otherwise qualified" and that its actions prevented Plaintiff's participation in or denied him access to a service, program, or activity. The State argues, however, that it did not discriminate against Plaintiff based on his disability. It maintains that Plaintiff was denied the bi-aural headphones he ordered because "[Plaintiff] failed to *mail* them to the prison before the implementation of D.O. 909" (Doc. # 94 at 12) (emphasis added). Thus, the State argues, the headphones were unauthorized property, which Plaintiff was not entitled to possess at the relevant time.

The State is flatly mistaken about the specific facts at issue in this claim. As the evidence reflects, Plaintiff arranged to have four items shipped to the prison *before* the effective date of DO 909: (1) a typewriter; (2) a television; (3) a calculator; and (4) and the headphones. The typewriter arrived at the prison on October 8, 1999, before DO 909's effective date, and it was eventually issued to Plaintiff. The television, calculator, and headphones all were logged by the prisoner property staff on October 11, 1999, DO 909's effective date (Doc. # 106, Ex. 29). These items, therefore, "*must*" have been mailed to and received by the prison before the policy's effective date, contrary to the State's contention. Further calling the State's argument into question is that the television and the calculator were issued to Plaintiff, while the headphones were not. Id.

Plaintiff argues that because he was issued the television and calculator but not the headphones, one can therefore infer discriminatory animus. The Court agrees. In view of the State's complete failure to rebut Plaintiff's evidence, the Court finds that a discriminatory animus can be inferred from the State's failure to provide Plaintiff with his bi-aural headphones.[4] The Court must, therefore, determine whether the prison's actions violated Plaintiff's constitutional rights.

### 2.   **Constitutional Prong**

To meet the second prong in Goodman, Plaintiff argues that the State's refusal to issue him his headphones violated his First Amendment rights. Specifically, Plaintiff argues that "t.v.7was a window to the freeworld through which information flowed to him" (Doc. # 105 at 20).

"[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Thornburgh v. Abbott, 490 U.S. 401, 407 (1989) (quoting Turner v. Safley, 482 U.S. 78 (1987)). A prisoner retains his First Amendment rights to the extent that such rights "are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" Asker v. California Dep't of Corr., 350 F.3d 917, 922 (9th Cir. 2003). "A prisoner regulation that impinges on inmates' constitutional rights therefore is valid only if it is 'reasonably related to legitimate penological interests.'" Id. (quoting Turner, 482 U.S. at 88).

Plaintiff fails to satisfy the constitutional prong of Goodman for three reasons. First, an inmate has no constitutional right to watch television. Scheanette v. Dretke, 199 Fed.Appx. 336 (5th Cir. 2006). Second, Plaintiff was still able to receive "information, ideas, and messages" through books, magazines, and newspapers; the television is not the sole conduit for information. Finally, Plaintiff acknowledged in his verified First Amended Complaint that he was able to hear his television with his hearing aids; Plaintiff has proffered no evidence to support that he is now unable to hear the television with his hearing aids.

---

[4] The Court notes that Plaintiff did, eventually, receive his headphones on October 18, 2001 (Doc. # 106, PSOF ¶ 48).

- 12 -

Because Plaintiff cannot establish a violation of his constitutional rights, Defendant is entitled to summary judgment on this claim.

### B.    Personal Notice of Prison Activities

In Count X, Plaintiff claims that the State's refusal to personally alert him to prison activities also violates Title II of the ADA. Plaintiff fails to establish even the first prong under Goodman. First, no evidence supports that the State refused to personally alert Plaintiff to prison activities based on his disability. Even "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. Here, there is no evidence that the State's actions were motivated by any discriminatory animus. Second, Plaintiff has acknowledged that he can hear to some extent when he uses his hearing aids. As a result, Plaintiff has not established that he requires personal notice to be alerted to prison activities (Doc. # 95, DSOF ¶ 48). Accordingly, Defendant will be granted summary judgment on Count X.

## CONCLUSION

For the reasons discussed herein, the Court finds that Defendants are entitled to summary judgment on Plaintiff's RLUIPA and Free Exercise claims because Defendant did not substantially burden Plaintiff's right to practice his religion and, in any case, has advanced legitimate penological interests for the challenged policies and restrictions. The Court also finds that Defendants are entitled to summary judgment on Plaintiff's ADA claims because he failed to demonstrate that his constitutional rights have been violated or that Defendant discriminated against him on the basis of his disability.

In accordance with the foregoing,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. # 94) is **GRANTED**. The Clerk must enter judgment terminating this action.

DATED this 16th day of March, 2007.

*/s/ Earl H. Carroll*
Earl H. Carroll
United States District Judge